IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RUSSELL JOHNSON,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        CASE NO. 3:24-CV-360-KFP
                                   )
TUSKEGEE UNIVERSITY, et al.,       )
                                   )
        Defendants.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Russell Johnson alleges civil rights violations arising from his time as a student attending Tuskegee University. Plaintiff's Amended Complaint names Tuskegee University, Gemechu Wirtu, Ruby Perry, Shaik Jeelani, and Olga Bolden-Tiller as defendants (collectively "Defendants"). In Plaintiff's Amended Complaint, Plaintiff alleges Defendant Tuskegee violated Title IX through deliberate indifference to sexual harassment (Count I) and failure to comply with procedural requirements (Count III). Plaintiff alleges that Tuskegee, Perry, and Wirtu retaliated against him in violation of Title IX (Count II). Plaintiff claims through 42 U.S.C. § 1983 Defendants denied him his due process rights in violation of the Fourteenth Amendment (Count IV). Finally, Plaintiff asserts Alabama state law claims of intentional infliction of emotional distress and breach of contract against all Defendants (Counts V and VI).

The parties consented to a United States Magistrate Judge conducting all proceedings in this case through final judgment. Docs. 30–31. Before the Court is Defendants' Motion for Summary Judgment (Doc. 71) and supporting brief (Doc. 72).

Upon consideration of the motion, along with Plaintiff's Response (Doc. 76), Defendants' Reply (Doc. 77), Defendants' Objections to Plaintiff's Summary Judgment 'Evidence' (Doc. 78), and Defendants' evidentiary submissions (Docs. 73),[1] the Court finds that Defendants' Motion for Summary Judgment is due to be granted.

## I.     SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party . . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for "summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required

---

[1] Plaintiff filed an "Evidentiary Submission in Opposition to Defendants' Motion for Summary Judgment" on July 30, 2025. Doc. 79. Plaintiff's deadline for this submission was July 22, 2025. Doc. 74. Plaintiff did not file this submission with leave of Court. In the Evidentiary Submission, Plaintiff presents no argument as to why the Court should consider the enclosed materials. A "[d]istrict court's refusal to consider an untimely opposition to summary judgment motion is not an abuse of discretion." *Mosley v. MeriStar Mgmt. Co.*, 137 F. App'x 248, 249 (11th Cir. 2005) (per curiam). For these reasons, the Court declines to consider the untimely, out-of-turn evidentiary submission filed by Plaintiff.

to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The relevant rules of substantive law dictate the materiality of a disputed fact." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). In determining whether a genuine dispute of fact for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a).

## II.    JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1343 over this case arising from claims under Title IX. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Personal jurisdiction and venue are not contested, and the Court concludes that venue properly lies in the Middle District of Alabama. 28 U.S.C. § 1391.

## III.    BACKGROUND[2]

The claims underlying this action arise from a series of internal complaints Plaintiff, a Ph.D. student, filed with Tuskegee as set out in the following timeline.

---

[2] The Court presents only those facts pertinent to resolving the Motion for Summary Judgment. "[T]he facts at this stage are what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party who was opposing summary judgment." *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020).

- September 12, 2020: Plaintiff's first internal complaint, "sent to the president via certified mail," involved claims of retaliation arising from a confrontation with Professors Bellamy and Allred. Doc. 73-1 at 80:18–81:20; Doc. 73-2 at 25–29

- February 11, 2021: Plaintiff's complaint was submitted to Tuskegee University via a student complaint form. Doc. 73-1 at 157:5–9. The complaint alleged a series of three instances in which fellow student Lauren Mayo committed physical or verbal assaults against him. Doc. 73-2 at 64.

The September 2020 and February 2021 complaints were consolidated.[3] *Id.* at 100. The "academic matters" involved in these complaints were resolved on November 29, 2021. *Id.*

- January 20, 2022: Plaintiff received an email from Mia Hollingsworth,[4] Tuskegee's Title IX coordinator, communicating that the "gender disparity and retaliation" claims in the consolidated complaints were transferred to the Title IX Office. Doc. 73-1 190:8–15; Doc. 73-2 at 100; Doc. 73-3 at 17:9–14.

- March 31, 2022: The Title IX Hearing Board[5] reached a final determination and disposed of the gender disparity and retaliation claims and concluded there was no Title IX violation arising from the consolidated September 2020 and February 2021 complaints. Doc. 73-2 at 100; Doc. 73-3 at 19:1–18.

- April 6, 2022: Plaintiff claims "he received the evidence used by the Title IX Hearing Board in rendering their decision, which included an unsigned letter

---

[3] The record is unclear as to when the consolidation of these complaints occurred. It is presumed that consolidation happened at some point after February 2021, but prior to November 29, 2021, as that is when a portion of the claims were resolved. Doc. 73-2 at 100.

[4] This is the same individual who serves as Plaintiff's counsel, and who is the subject of Defendant's Motion to Disqualify (Doc. 63). At the time of Plaintiff's on-campus complaints, Mia Hollingsworth was Mia Maxwell and was serving as Tuskegee's Title IX Coordinator. To avoid perpetuating confusion about the dual role of Tuskegee's former Title IX Coordinator and Plaintiff's current counsel, the Court uses the reference Mia Hollingsworth throughout this opinion.

[5] Mia Hollingsworth created the Hearing Board and trained the Hearing Officers. Doc. 73-3 at 22:17–21.

4

from Dr. Bolden-Tiller and Dr. Wirtu to Ms. Mayo accusing Plaintiff of wrongdoing." Doc. 72 at 9 (citing Doc. 34 ¶ 27).

- April 25, 2022: Plaintiff filed a new Title IX Complaint naming Dr. Ruby Perry as the wrongdoer. In it, Plaintiff claims that interactions with Perry have been unwelcome and uncomfortable and that Perry retaliated against Plaintiff by threatening withdrawal of funding. Doc. 73-2 at 99.

- April 29, 2022: Dr. Perry and Dr. Wirtu resigned as advisors from Plaintiff's dissertation advisory committee. Doc. 17-1 at 2–3; Doc. 73-3 at 68.

- May 3, 2022: The April 2022 Complaint was transferred by the Title IX Office to the Office of Graduate Studies and Research because it did not have a basis in Title IX law. Doc. 73-2 at 98, 101.

- July 6, 2022: Plaintiff filed a new Title IX claim. Doc. 73-3 at 68. This claim alleged Dr. Wirtu and Dr. Perry retaliated against Plaintiff by resigning from his dissertation's advisory committee. Doc. 73-3 at 68; Doc. 73-1 at 219:9–23.

- August 10, 2022: Mia Hollingsworth, in her role as Title IX Coordinator, reached a determination as to the July Title IX Complaint finding that Plaintiff was retaliated against in violation of Title IX. Doc. 73-2 at 104–111.

- October 25, 2022: A letter from Dr. Jeelani dated October 25, 2022, informed Crystal James, Interim Vice President for External Affairs and General Council, that following deliberation of a committee of three members of the Graduate Council wherein they reviewed Plaintiff's complaints of retaliation, complaints about Mayo's hostile attitude, and "intimidating and non-supporting" demeanor of Perry, the committee "found no basis for the concerns [Plaintiff] presented." *Id.* at 112.

A.    **Factual Narrative Concerning Plaintiff's Internal Complaints and Title IX Complaints**

i.    **Admission into Tuskegee's Ph.D. Program**

Plaintiff graduated from Veterinary School in May 2019. Doc. 73-2 at 7. The following year, in May 2020, Plaintiff applied to two different programs offered by the Tuskegee University College of Veterinary Medicine (Tuskegee): the Large Animal Internship and the Ph.D. Program. Doc. 34 ¶ 8. Before his admission into either program, he began taking coursework at Tuskegee in 2019 that could be applied to his Ph.D. requirements. Doc. 73-1 at 59:16–60:5. He ultimately chose to pursue the Ph.D. Program rather than the Large Animal Internship, Doc. 34 ¶¶ 8–9, and submitted his Application for Admission to Candidacy in May of 2020, which cited his research proposal of studying the effects of melatonin in cattle when "monitoring ovarian activity and blood flow, [and the] developmental potential of oocytes." Doc. 73-2 at 12, 16; Doc. 73-1 at 58:22–62:1. He was approved for admission, and Defendants Wirtu and Bolden-Tiller served in advisory roles for Plaintiff's research dissertation. Doc. 73-2 at 15; Doc. 73-1 at 58:22–62:1. At the time his application was approved, Defendant Jeelani was the Dean of Graduate School & Vice President for Research and Defendant Perry was the College Dean. Doc. 73-2 at 15; Doc. 73-1 at 61:2–6.

ii.    **Interactions with Lauren Mayo**

While in the Ph.D. program, Plaintiff's classmate, Lauren Mayo, reportedly harassed and physically assaulted Plaintiff. Plaintiff's Amended Complaint cites to three specific incidents between Mayo and Plaintiff. Doc. 34 ¶¶ 10–15. The first incident

occurred on October 22, 2019 (October Incident). During the October Incident, Mayo hit and grabbed Plaintiff's leg before Plaintiff exited her car.[6] *Id.* ¶ 10; Doc. 73-1 at 123:4–124:13; 151:17–152:20; Doc. 73-2 at 64. Mayo never made any sexual comments to or around Plaintiff. Doc. 73-1 at 258:14–259:8. Plaintiff claimed that when he reported the incident to his advisors, Wirtu and Bolden-Tiller, they did nothing in response. Doc. 34 ¶¶ 11; Doc. 73-1 at 125:20–126:9.

Plaintiff alleged two other incidents (December Incidents) which occurred on December 11, 2020, when he was "physically assaulted" by Mayo pushing his hand away from him while they were working at the Roanoke packing plant. Doc. 34 ¶ 12; Doc. 73-1 at 125:4–18; 153:1–10; Doc. 73-2 at 64. He then claimed Mayo assaulted him when Mayo attempted to close the door on him as he was entering into Bolden-Tiller's laboratory and told him to "fucking grow up." *Id.*; Doc. 34 ¶ 14; Doc. 73-1 at 113:15–115:10; Doc. 73-2 at 47. Following each of these incidents, Plaintiff submitted an informal report to Wirtu and Bolden-Tiller. Doc. 34 ¶¶ 13, 15; Doc. 73-2 at 44–47.

---

[6] In Plaintiff's Response, he cites to Defendants' evidence and characterizes the interaction as Mayo "groped Plaintiff." Doc. 76 at 3 (citing Doc. 73-1 at 258:14–23; Doc. 73-1 at 259:1; Doc. 73-1 at 155:14–156:1–15). The materials to which he cited do not reflect that Mayo "groped Plaintiff." During Plaintiff's deposition, he was asked if he was "contending that Lauren touched you in a sexual way?" He responded by saying: "Yeah. She grabbed my leg." Doc. 73-1 at 258:14–19. He additionally claimed in response to whether he thought she was sexually attracted to him that "I don't know what Lauren was . . . but she was very close to my member." *Id.* at 258:20–259:1. Elsewhere Plaintiff describes this interaction as Mayo grabbing and hitting his leg once during this drive. *Id.* at 124:11–13. In his internal complaint filed on February 11, 2021, he referred to this incident as "verbal and physical assault" but makes no mention of any groping. Doc. 73-2 at 64. From the evidence submitted, prior to the deposition, Plaintiff never referred to the "grab" or "touch" as anything other than "inappropriate physical contact" and physical assault. *See id.* at 61, 64, 66, 76, 96, 99, 100. Accordingly, the Court does not consider the actions groping.

### iii.    Confrontation with Allred[7]

Plaintiff alleged in an email to Wirtu that he was told to "leave the Vet School presmisses [*sic*] by Dr. Bellamy on May 7, 2020, because of a 'confrontation' with Dr. Allred[.]" Doc. 73-2 at 23. Plaintiff then filed a complaint (September 2020 Complaint) which was "sent to the president via certified mail" detailing the alleged confrontation. Doc. 73-1 at 80:18–81:4; Doc. 73-2 at 25–29. Plaintiff alleged Allred "came to Dr. Wirtu's office and asked for the Ultrasound Machine" and in response he told her "[he] was going to turn it back in to Diagnostics Imaging and she could check it out from there." *Id.* at 26. He alleges that this interaction between [himself] and Allred was later framed by Bellamy as a "confrontation," Doc. 73-1 at 75:10–13; Doc. 73-2 at 26–27. In response to this "confrontation," Plaintiff "fil[ed] [] th[e] complaint to have exposed, addressed, and resolved the underlying cause of . . . [this] incident." *Id.* at 26. In the September 2020 Complaint he speculated that the confrontation was based on his decision to "not accept the internship" and instead pursue the Ph.D. *Id.* at 27. Plaintiff appeared to believe that there was also a racial element to the confrontation and claimed "I'm a black man accused of being confrontational by a white woman [(Allred)]. That's an uncomfortable feeling, especially when a black woman [(Bellamy)] who was old enough to be your mother was supporting her and was not there to see it." Doc. 73-1 at 73:13–74:20.

---

[7] Plaintiff's Amended Complaint does not directly discuss his "confrontation" involving Professors Allred and Bellamy. However, for purposes of understanding Plaintiff's Title IX retaliation claims, the underlying dispute concerning these professors is repeated here.

### B.     Plaintiff's Formal Internal Complaints

In February 2021, Plaintiff filed an internal complaint with Tuskegee University concerning his advisors' refusal to address Mayo's conduct. Doc. 34 ¶ 16; Doc. 73-2 at 63–64. This internal complaint recites the allegations concerning the October Incident and December Incidents (*Id.* at 64), contains no mention about gender discrimination, and describes the incidents of Mayo "cursing," "yelling," and grabbing his leg while in the car. *Id.* It also describes Mayo "push[ing] [his] hand away" at the plant and pushing the door closed on him before verbally assaulting him. *Id.*

Plaintiff's September 2020 Complaint and February 2021 Complaint[8] were "consolidated" at some unspecified time following Plaintiff's submission. *Id.* at 100. Following consolidation, and on January 18, 2022, the outstanding issues concerning gender disparity and retaliation were transferred to the Title IX office. *Id.* On January 20, 2022, while employed as Tuskegee University's Title IX Coordinator, Mia Hollingsworth informed Plaintiff that his complaints had been received by the Title IX office. Doc. 34 ¶ 25; Doc. 73-1 at 190:8–15; Doc. 73-3 at 17:9–21.

Following receipt of the complaints, Mia Hollingsworth established a Title IX Hearing Board which then deliberated and reached a determination on March 31, 2022, concluding Plaintiff had not suffered gender disparity or retaliation. Doc. 73-2 at 100; Doc.

---

[8] A letter from the Office of General Counsel & External Affairs submitted as evidence describes a "February 19, 2021" email from Plaintiff that "alleged gender disparities and retaliation." Doc. 73-2 at 100. No party has made it clear the materiality of the email or provided a citation that would allow the Court to discern its relevance to this present matter.

73-3 at 19:1–18, 22:20–21; Doc. 34 ¶ 26. However, "[t]he investigation concluded that [Mayo's] conduct . . . was inappropriate, and a reprimand was issued." Doc. 73-2 at 100.

After the decision was reached, Plaintiff claims that on April 6, 2022, he received a piece of evidence used by the Title IX Hearing Board that he did not have access to prior to the hearing. Doc. 34 ¶ 27. This evidence was "an unsigned letter from Dr. Bolden-Tiller and Dr. Wirtu to Ms. Mayo . . . accusing [Plaintiff] of wrongdoing."[9] *Id.*; *see also* Doc. 73-3 at 24:16–25:11. It is unclear whose responsibility it was to relay this information to Plaintiff; normally in "an investigated complaint," Hollingsworth would have been responsible for sharing this information, but because the hearing board was "anonymous," the "proper process" was unclear to Hollingsworth. *Id.* at 25:21–27:4.

## C.    April Title IX Claim Against Perry

On March 10, 2021, Perry notified Plaintiff that she would be replacing Bolden-Tiller as one of Plaintiff's advisors, but that Wirtu would remain as Plaintiff's other advisor. Doc. 73-1 at 171:7–21; Doc. 73-2 at 90. Around the same time this change was made, Plaintiff contacted Perry about ultrasound machine training and Plaintiff then scheduled the training and coordinated access to the large animal chute with a representative from the PetTech Solutions training company. *Id.* at 79–88; Doc. 73-1 at 167:20–169:3, 169:10–170:16.

Plaintiff filed a formal Title IX Complaint against Perry on April 25, 2022. Doc. 34 ¶ 28; Doc. 73-1 at 187:16–188:4; Doc. 73-2 at 99; Doc. 73-3 at 27:5–17. In this complaint,

---

[9] This letter is not in the record before the Court.

he alleged that he was "threatened with the withdrawal of funding," "given an ultimatum to either work with a student who has verbally and physically assaulted me or not receive my PhD," and claimed that "[a] zoom meeting recording was altered to delete evidence supporting my allegations of bullying." Doc. 73-2 at 99. He further noted that the contact with Dr. Perry was "unwelcome and uncomfortable." *Id.* On May 3, 2022, the April Complaint was transferred because it "d[id] not allege discrimination on the basis of sex and as such d[id] not sound in Title IX law." Doc. 73-3 at 62; *see also id.* at 29:1–32:9.

### D.    July Title IX Claim Against Dr. Perry and Wirtu

On April 29, 2022, Plaintiff's advisors resigned from their positions on his dissertation advisory committee. Doc. 34 at ¶ 32; Doc. 72 at 12; Doc. 73-1 at 210:1–17; Doc. 17-1 at 3. In Perry's Declaration, she attested that "[o]n April 29, 2022, Dr. Wirtu notified me of his resignation from [Plaintiff's] dissertation committee. Without a Chair or a Co-Chair with subject-matter expertise for his dissertation, I could not serve in this capacity to advise his research." *Id.* at 2–3. She further explained that after discovering this she "immediately notified [Plaintiff] of Dr. Wirtu's resignation and reiterated that Tuskegee faculty lacked the expertise necessary for his very specific topic." *Id.* at 3.

On July 6, 2022, Plaintiff initiated a Title IX complaint alleging Perry and Wirtu engaged in "retaliation based on the resignation of his faculty advisory committee chair." Doc. 73-2 at 106; Doc. 34 ¶ 32. Hollingsworth was responsible for investigating the claims in the July 2022 complaint and drafting the decision. Doc. 73-3 at 36:21–39:6; 40:4–23. On August 10, 2022, Hollingsworth determined that Plaintiff was retaliated against by

Perry and Wirtu resigning from the advisory committee. Doc. 34 ¶ 33; Doc. 73-3 at 38:18–39:6; Doc. 73-3 at 66–73.

## IV.    DISCUSSION

Defendants seek summary judgment on all counts alleged by Plaintiff. The Court will begin by addressing Plaintiff's Title IX claims: first, discussing Defendants' arguments concerning Plaintiff's Title IX claims against the individual defendants; next, discussing Defendants' arguments concerning whether Plaintiff's deliberate indifference and failure to comply claims are time-barred; and, finally, addressing the merits of Plaintiff's retaliation claim. The Court will then address Defendants' arguments concerning the applicability of § 1983 to Defendants. Finally, the Court will evaluate the state law claims asserted against Defendants for intentional infliction of emotional distress and breach of contract.

### A.    <u>Title IX Claims Against Individual Defendants</u>

Plaintiff's Amended Complaint states three separate counts against Defendants for violations of Title IX. In Count I, Plaintiff includes a narrative that discusses the actions of certain individual actors, but he only names Tuskegee University in Count I. Likewise, Count III only names Tuskegee University. In Count II, his retaliation claim, Plaintiff names Tuskegee University in addition to Dr. Perry and Dr. Wirtu. Doc. 34 ¶¶ 44–48. Defendants' Motion for Summary Judgment argues that to the extent Plaintiff has named individual defendants in his Title IX claims, these claims are due to be dismissed because there is no individual liability under Title IX. Doc. 72 at 14.

"Title IX is enforceable against institutions and programs that receive federal funds, but does not authorize suits against individuals." *Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015) (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 247 (2009)). As such, any claims asserted against individual defendants under Title IX are not actionable. To the extent Plaintiff names any individual defendants in his Title IX claims, summary judgment is due to be awarded to Gemechu Wirtu, Ruby Perry, Shaik Jeelani, and Olga Bolden-Tiller because Title IX does not allow for suits against individuals to proceed.

**B.     Title IX Claims Against Tuskegee University**

Plaintiff asserts three counts against Tuskegee under Title IX. He argues that Tuskegee was deliberately indifferent to sexual harassment (Count I); that Tuskegee retaliated against him (Count II); and that Tuskegee failed to comply with administrative procedures (Count III). Doc. 34 ¶¶ 34–53. Defendants argue that summary judgment should be awarded on these counts because the deliberate indifference and failure to comply claims are time-barred and Plaintiff has failed to satisfy the evidentiary standard for proving Title IX retaliation. Doc. 72 at 15–16, 18–21.

> **1.     *The deliberate indifference and failure to comply claims are time-barred.***

Defendants argue that the deliberate indifference and failure to comply claims are barred by the applicable statute of limitations. Plaintiff responded that the statute of limitations should be tolled. The court will first address the accrual date argument and then proceed to analyze whether tolling applies.

13

### a.     The claims fall outside the statute of limitations.

Plaintiff alleges in Count I of his Amended Complaint that after being "sexually harassed" and reporting this harassment to Tuskegee, that Tuskegee's "acts and omissions. . . in response to those reports constitute deliberate indifference to student-on-student sexual harassment." Doc. 34 ¶ 35–37. In Count III of his Amended Complaint, Plaintiff alleges that "Tuskegee [] failed to follow Title IX regulatory procedures regarding investigations conducted by its employees," and "failed to provide Plaintiff evidence used to make a finding on Plaintiff's original complaint during the investigative stage in order to allow Plaintiff an opportunity to view and comment on that evidence." *Id.* ¶¶ 50–51. Defendants argue the Title IX claims, Counts I and III are untimely and fail as a matter of law. Doc. 72 at 15–16.

"Because Congress did not provide a statute of limitations for Title IX, the 'most closely analogous' statute of limitations under state law governs the federal cause of action." *M.H.D. v. Westminster Schs.*, 172 F.3d 797, 803 (11th Cir. 1999) (citing *Reed v. United Transp. Union*, 488 U.S. 319, 323 (1989)). "Courts generally agree that a Title IX claim for damages is most closely analogous to a common law action for personal injury; therefore, the statute of limitations for personal injury actions controls." *Id.* Section 6-2-38(1) of the 1975 Alabama Code "allows two years from the date of accrual of the cause of action to file a claim." *Beasley v. Ala. State Univ.*, 966 F. Supp. 1117, 1128 (M.D. Ala. 1997). "Title IX, is therefore, subject to the two-year statute of limitations of § 6-2-38(1)." *Id.* "Accrual, for purposes of the statute of limitations, occurs 'when the plaintiff has a complete and present cause of action,' which happens when [he] 'can file suit and obtain

14

relief.'" *Hurt v. Shelby Cnty. Bd. of Educ.*, 198 F. Supp. 3d 1293, 1314 (N.D. Ala. 2016) (quoting *Bay Area Laundry and Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). Determining when "a cause of action is complete [is] 'when the plaintiff knows or has reason to know of the injury which is the basis of the action.'" *Id.* (quoting *Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980)).[10]

The parties do not dispute that the accrual date for the deliberate indifference claim is March 31, 2022—when the Hearing Board made the decision finding that Plaintiff's Title IX rights were not violated. *See* Doc. 76 at 9.

Defendants argue that the failure to comply claim accrued on April 6, 2022, because that is when the Amended Complaint provides Plaintiff "learned of Tuskegee's alleged failure to provide him [] evidence." Doc. 72 at 16 (citing Doc. 34 ¶ 27). Viewed in the light most favorable to Plaintiff, *see Underwood v. City of Bessemer*, 11 F.4th 1317, 1327 (11th Cir. 2021) ("[C]ourts must construe the facts and draw all inferences in the light most favorable to the nonmonving party[.]"), the Court will accept as true that Plaintiff learned of this failure on April 6, 2022; thus, the failure to comply claim accrued on this date.

To determine if these claims are timely, the Court identifies the date that the lawsuit was brought and looks back two years. *See Beasley*, 966 F. Supp. at 1128. Plaintiff filed his Complaint on June 14, 2024; thus, the accrual date for both claims would have to occur on or after June 14, 2022, to fall within the statute of limitations. Given the March 31,

---

[10] Opinions issued by the former Fifth Circuit prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

2022, accrual date for the deliberate indifference claim and the accrual date of April 6, 2022, for the failure to comply claim, the Court finds that Defendants have established the deliberate indifference claim (Count I) and the failure to comply claim (Count III) fall outside the statute of limitations.

### b.    Tolling statute of limitations

Plaintiff argues the statute of limitations should be tolled because his Office of Civil Rights (OCR) Complaint is still undergoing review in the administrative proceeding and the investigation is not complete. Doc. 76 at 9. Additionally, Plaintiff asserts these "claims also clearly fall under the continuing violation doctrine." *Id.* at 10. Defendants first argue that even though Plaintiff filed a separate complaint with the OCR, that filing did not toll the statute of limitations. Doc. 72 at 15 n.10. They also argue that Plaintiff's allegation concerning the applicability of the "continuing violation doctrine" is a red herring because "[e]ven if the alleged violation were continuing, there are no allegations of adverse action within the actionable statutory time period." Doc. 77 at 4 n.3.

To start, Plaintiff presents the Court with an opinion entered at the motion to dismiss stage in *Beasley v. Alabama State University*, 966 F. Supp. 1117 (M.D. Ala. 1997), arguing that the Court's reasoning in *Beasley* supports a finding that "Plaintiff's Title IX claims . . . . are not time barred as the statutory period has been tolled during the pendency of the administrative proceedings." Doc. 76 at 9–10. Plaintiff asserts that "[u]nder Alabama law, 'pursuit of an elective grievance procedure tolls the applicable statute of limitations' during the pendency of administrative proceedings." *Id.* at 9 (quoting *Beasley*, 966 F. Supp. at 1131). Plaintiff explains that this principle should guide the Court's reasoning because

when Plaintiff filed his complaint with OCR on May 26, 2022, that complaint "commenced an investigation" that is still undergoing review, thus protecting his federal claims from being time-barred. *Id.*

Defendants point out that Plaintiff's line of argument conveniently leaves out the fact that a subsequent opinion in the same *Beasley* case actually decides the tolling issue and does so in a manner contrary to Plaintiff's argument and selective citation. 3 F. Supp. 2d 1325, 1337 (1998). In this opinion entered at the summary judgment stage, the Court explained that "[i]n its previous order, the [C]ourt remarked upon the possibility, *without actually deciding*, that the running of the statute should be tolled during the pendency of the administrative proceedings[.]" *Beasley*, 3 F. Supp. 2d at 1339 (emphasis added). But upon examination of the issue, the Court explained that because "the exhaustion of administrative remedies before the OCR is not a prerequisite to filing suit under [] Title IX," then "the administrative remedies [plaintiff] pursued before the OCR were merely elective and she could have filed suit in this court even while they were pending." 3 F. Supp. 2d at 1343. Thus, the court found "it may not toll the running of the two-year statute of limitations for the duration of the OCR proceedings." *Id.* Thus, this later *Beasley* opinion controlled the issue in that case.

Defendants rely on the holding in that summary judgment opinion to argue that the Court's decision here should similarly be guided by the fact that Plaintiff's decision to file an OCR claim was elective and thus does not toll the statute of limitations. *See* Doc. 77 at 3. Plaintiff presents no rebuttal argument, 3 F. Supp. 2d at 1343, and in fact, Plaintiff concedes that he pursued "an elective grievance procedure." Doc. 76 at 10. The Court

17

agrees with Defendants. The OCR elective administrative procedures did not prevent Plaintiff from filing suit while the claims were pending; thus, the statute of limitations is not tolled during the pendency of Plaintiff's OCR claim. *See Beasley*, 3 F. Supp. 2d at 1343.

Plaintiff also argues that his "claims [] clearly fall under the continuing violation doctrine." Doc. 76 at 10. The claims comprising the "continuing violation" allegedly include "the filing of his complaints of gender discrimination under Title IX back in 2021 and [the] continued [] fil[ing] of complaints regarding the continued and escalating retaliatory conduct up until July 7, 2022." *Id.*

Under the continuing violation doctrine "accrual of a plaintiff's civil rights claim is deemed to be postponed until the final instance of allegedly discriminatory behavior." *Beasley*, 3 F. Supp. at 1331. A continuing violation can be found under two standards: the "continual acts standard" or the "systematic policy of discrimination standard." *Id.*

While Plaintiff claims in his Response that the retaliatory conduct continued up to July 7, 2022, he cites to no evidence supporting this assertion. Doc. 76 at 10. Plaintiff concedes that the accrual date for all Title IX claims was on March 31, 2022. *Id.* at 9. The July 6, 2022, Title IX complaint was Plaintiff's final Title IX complaint and involved "*new allegations of retaliation*" based on the resignation of Wirtu on April 29, 2022. Doc. 73-2 at 106 (emphasis added); *see also* Doc. 76 at 21. Nowhere in his Response or Amended Complaint does Plaintiff "identify any alleged protected activity or adverse action" that took place within the statute of limitations. Doc. 77 at 4.

Plaintiff has failed to show how the claims in Counts I and III are subject to either standard under the continuing violation doctrine. *See Beasley*, 3 F. Supp. at 1331. In

addition, as described earlier, Plaintiff has not shown how tolling is applicable to either of these claims. For the above stated reasons, Tuskegee is due to be awarded summary judgment on Plaintiff's claims of deliberate indifference and failure to comply because the claims are time-barred and not subject to the continuing violation doctrine or tolling.

### 2. *Retaliation claim*

In Count II, Plaintiff claims that Tuskegee retaliated against him in violation of Title IX. Doc. 34 ¶¶ 40–48. Specifically, Plaintiff alleges Tuskegee "failed to take any action to correct or remediate the adverse consequences Plaintiff suffered as a result of the withdrawal by the advisors and members from Plaintiff's Ph.D. committee." *Id.* ¶ 44. The alleged act of retaliation was the April 29, 2022, resignation of advisors Perry and Wirtu. *Id.*; Doc. 73-2 at 106. Defendants argue that Plaintiff has failed to establish a prima facie case for Title IX retaliation. Doc. 72 at 18–21.

"Retaliation claims under Title IX are analyzed under the framework for claims under Title VII of the Civil Rights Act of 1964." *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 686 (11th Cir. 2019) (per curiam).[11] Traditionally, to satisfy his burden, Plaintiff must establish "(1) that [he] engaged in statutorily protected expression; (2) that [he] suffered an adverse . . . action; and (3) that there is some causal relation between the two events." *Id.* (internal quotations removed). After a plaintiff meets their burden, a presumption of retaliation is created, and the "burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason

---

[11] Here, and elsewhere in this Opinion, the Court cites to non-binding authority. While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

for the employment action." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020). "If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the 'proffered reason was merely a pretext to mask [retaliatory] actions.'" *Id.* (alteration in original) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). In establishing causation, "a plaintiff must demonstrate that '[his] protected activity was a but-for cause of the alleged adverse action by the [defendant]'" *Id.* (quoting *Univ of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). In the course of this burden-shifting, "the ultimate burden of persuasion remains on the [plaintiff]." *Id.* (quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013)).

For purposes of summary judgment, Defendants concede that Plaintiff could satisfy the elements of engaging in statutorily protected expression and suffering an adverse action. Doc. 72 at 19. Defendants argue that Plaintiff cannot meet the final element of proving that the adverse action (withdrawal of advisors) was causally related to the protected activity (filing Title IX complaints). *Id.* Thus, the Court focuses the analysis on this element of the claim.

Plaintiff responds to the retaliation claim with argument that is nearly entirely devoid of record reliance and legal authority in contravention of the Court's order. *See* Doc. 39 at 1 ("In all briefs, the discussion of evidence in the brief must include a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document. Failure to make a specific reference may result in the evidence not being considered by the Court."). Plaintiff provides the Court with a single record citation in opposition to Tuskegee's argument and a single legal citation providing the elements of the

claim. The Court does not have to emulate "pigs [] hunting for truffles buried in briefs" in order to substantiate this claim. *See Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Despite the lack of development, the Court will analyze the claim.

Plaintiff refers to the August 10, 2022, decision of the Title IX office as support for his argument that he suffered "intentional retaliation in violation of . . . Title IX." Doc. 76 at 20. Plaintiff argues "Tuskegee now seeks to change its position and state there was no retaliation." *Id.* Plaintiff appears to contend that Tuskegee is bound by the Title IX Office's internal determination and cannot in this litigation argue against the legal sufficiency of the claim. Plaintiff's argument, however, fails to rely on any legal authority. Likewise, Plaintiff appears to mandate that the Court adopt the Title IX office's conclusion, also without citation to any authority. But there is no evidence before the Court that the Title IX office considered the claim under the legal framework that the Court must apply here. Therefore, there is nothing before the Court showing it must adhere to the Title IX Office's decision.

Additionally, Plaintiff argues that "Defendant's focus on the advisory committee is displaced." *Id.* at 21. Without citing to any evidence, Plaintiff claims "[t]he evidence, including Plaintiff's testimony clearly demonstrates, the resignation happened because Plaintiff continued to pursue his complaints about both Ms. Mayo and the subsequent hostile environment he experienced after pursuing complaints against faculty members, specifically Defendant Dr. Perry." *Id.* at 21. Plaintiff's argument depends wholly upon unsupported theories about the motives of faculty members. This is the substance of Plaintiff's entire argument regarding his prima facie retaliation claim.

Defendants maintain Plaintiff cannot establish that retaliation was the but-for cause of his advisory committee's dissolution. Doc. 72 at 20. In support of this, Defendants cite to the length of time between the resolution of Plaintiff's "gender discrimination" complaints and when his advisory committee dissolved. *Id.* at 19–20. However, in doing so, Defendants misstate the date of resolution: Defendants claim the gender-related complaints were resolved in March 2021, but they were actually resolved in March 2022. In addition, Defendants fail to mention the date when Plaintiff filed his Title IX complaint against Perry in April 2022. Per Plaintiff's Amended Complaint, the "protected activity" he engaged in was "repeatedly reporting violations of Title IX to officials with authority to correct or remediate these violations." Doc. 34 ¶ 42. Thus, though Plaintiff fails to clearly argue it, based on the record, the Court understands his complaint against Perry was one of these reports he asserts as protected activity. The Court assumes, without deciding, that this April 2022 complaint was protected activity.[12]

The proximity between the protected activity and retaliatory conduct "must be very close." *Brown v. Berg Spiral Pipe Corp.*, 2011 U.S. Dist. LEXIS 92041, at *46 (S.D. Ala. Aug. 17, 2011). "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" *Hurlbert v. St. Mary's Health Care. Sys., Inc.*, 439 F.3d 1287, 1298 (11th Cir. 2006) (quoting *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). Plaintiff claims the "repeated[]" filing of Title IX violations

---

[12] Though the complaint was made to the Title IX Office, it was transferred out to the Office of Graduate Studies and Research because it was not based in Title IX.

resulted in retaliation. Doc. 34 ¶ 42; *see also* Doc. 76 at 21. Plaintiff filed a Title IX Complaint against Perry on April 25, 2022. Doc. 73-2 at 99. Defendants Wirtu and Perry resigned from Plaintiff's advisory committee on April 29, 2022. Doc. 73-3 at 68. As the resignations of the faculty members are in close temporal proximity of days after Plaintiff's Title IX claim was initiated against Dr. Perry, the Court finds for purposes of summary judgment that Plaintiff has made a prima facie case of retaliation by showing temporal proximity between the act of filing a Title IX complaint and the dissolution of his advisory committee. *Hurlbert*, 439 F.3d at 1298.

At this stage, the "burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Gogel*, 967 F.3d at 1135. To this end, Defendants explain that the Title IX investigation into Plaintiff's claim revealed that Dr. Wirtu stepped down due to Plaintiff's "lack of progress" toward his dissertation and Plaintiff's "lack of focus and difficulty with himself and others in communicating with [Plaintiff]." Doc. 73-3 at 62:1–7; *see also id.* at 72. While Tuskegee's August Title IX decision found that "Dr. Perry has simply stated that she does not intend to continue serving as an advisor without offering any explanation" (*Id.*), Perry's Declaration provides the explanation, and she stated specifically that after Wirtu resigned, she was not a subject-matter expert and "could not serve in this capacity to advise [Plaintiff's] research." Doc. 17-1 at 2–3. Perry further explained that she "immediately notified [Plaintiff] of Dr. Wirtu's resignation and reiterated that Tuskegee faculty lacked the expertise necessary for his very specific topic." Doc. 17-1 at 3. Perry's admissions are supported by Plaintiff's admissions in his deposition; when he was asked if

Wirtu and Perry were qualified to serve as co-advisors, Plaintiff only acknowledged that Wirtu was. Doc. 73-1 at 211:1–4. Evidence in the record shows that after the dissolution Plaintiff made no further attempts to register for classes, discern the reason why his advisors left their positions, or even try to find new advisors. *Id.* at 210:7–23; 213:23–214:17; 215:9–216:15.

The evidence and argument presented by Defendants shows that Wirtu provided reasons related to Plaintiff's lack of progress and lack of focus, and that Perry was unqualified to remain as Plaintiff's lone advisor. "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." *Hammonds v. Hyundai Motor Mfg. Ala.*, LLC, 2011 U.S. Dist. LEXIS 69264, at *21–22 (M.D. Ala. June 28, 2011) (quoting *Worley v. City of Lilburn*, 408 F. App'x 248, 251 (11th Cir. 2011) (per curiam)). The reasons proffered by Tuskegee for the dissolution of Plaintiffs' advisory committee express a substantive rationale for Wirtu and Perry leaving; therefore, the Court finds that Tuskegee provided a nondiscriminatory, nonretaliatory reason for the action.

In addressing the pretext argument, Plaintiff argues Defendants' proffered reason is simply an excuse and there is no record of the lack of Plaintiff's progress, but he offers no evidence to rebut the explanation head-on and show Wirtu's true reason was retaliation for the Title IX complaint or that Perry's corresponding decision was anything other than lack of expertise to carry on the task solo. He does argue that the Graduate Student Handbook requires changes in advisors to be approved by the Dean of the Graduate School and

contends there is no evidence of this approval. Doc. 76 at 21–22. Plaintiff cites to the Graduate Handbook, Section III.m. (Doc. 73-5 at 22), but this section notes the procedure for approving a *student's* request for changes for IBS and IPPD programs and not for faculty's decision to make a change. *See id.* ("In the event the approval cannot be secured, the student may petition for the change to the Dean of Graduate School who will make a decision on the basis of the information presented."). Plaintiff's reliance on the nonexistence of an approval for the resignation does not support an inference of retaliation.

"[C]onclusory allegations of [retaliation], without more, are not sufficient to raise an inference of pretext of intentional [retaliation] where [an employer] has offered . . . extensive evidence of legitimate, non-[retaliatory] reasons for its actions.'" *Spence v. Panasonic Copier Co.*, 46 F. Supp. 2d 1340, 1349 (N.D. Ga. 1999) (fourth alteration in original) (quoting *Young v. Gen. Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)). "The onus is upon the parties to formulate arguments." *Talley v. Penske Truck Leasing Corp.*, 2023 U.S. Dist. LEXIS 132311, at *3 n.1 (S.D. Fla. July 28, 2023) (quoting *Hewlett-Packard Co. v. CP Transp. LLC*, 2012 U.S. Dist. LEXIS 145179, at *6 (S.D. Fla. Oct. 9, 2012)).

"[I]n determining whether the plaintiff has met [his] burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for [his] alleged protected act," his advisory committee would not have dissolved. *Gogel*, 967 F.3d at 1137. To meet this burden, "[i]t is simply 'not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.'" *Id.* (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96

(6th Cir. 1997)). Plaintiff's argument concerning the Graduate Handbook does not demonstrate pretext.

In addition, Plaintiff raises another argument to show that he has established pretext for the retaliation by relying on the close temporal proximity between Wirtu's resignation and the July 6, 2022, Title IX complaint. Doc. 76 at 22. While "[c]ausation may be inferred by a close temporal proximity between the protected activity and the adverse action," *Bowers v. Bd. of Regents of the Univ. Sys. Of Ga.*, 509 F. App'x 906, 911 (11th Cir. 2013), Plaintiff's reliance on his subsequent Title IX complaint to support an inference based on temporal proximity is ineffective. Doc. 76 at 22. Plaintiff has not articulated how the *subsequent* filing of a Title IX claim caused the earlier dissolution of his advisory committee or his inability to register for classes. *Id.*; *see* Doc. 77 at 8.

Whether viewed under the pretext framework specifically or more generally on the record as a whole, it is Plaintiff's burden to show there is some evidence from which a reasonable jury could conclude the dissolution was retaliation for filing a Title IX complaint. *See Sanusi v. Grady Mem'l Hosp. Corp.*, 2025 WL 1661912, at *2 (11th Cir. June 12, 2025) (noting a plaintiff relying on circumstantial evidence for a retaliation claim may use the burden-shifting approach or "[a]lternatively, a plaintiff may prove . . . retaliation by simply presenting a 'convincing mosaic' of evidence sufficient to allow a reasonable factfinder to infer intentional discrimination or retaliation.") (first citing *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946–47 (11th Cir. 2023); then citing *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310–11 (11th Cir. 2023). This record does not support that premise. In conclusion, Plaintiff has not presented any evidence showing that

the reason given for Perry and Wirtu's withdrawal was a pretext for retaliation or that retaliation should otherwise be inferred. Lack of evidence that the withdrawal was approved (or disapproved) does not toe the line. While Plaintiff has made a prima facie case of retaliation in violation of Title IX, Defendants have established nonretaliatory reasons for the withdrawal of his advisors. Plaintiff failed to present argument or evidence in response showing that the nonretaliatory reason was pretextual or otherwise that there is enough evidence to permit a reasonable factfinder to find retaliation. For these reasons, Tuskegee is due to be awarded summary judgment on Count II.

### C.    Section 1983 Claims

In Count IV, Plaintiff alleges under § 1983 that Defendants violated the Fourteenth Amendment to the U.S. Constitution by denying his "constitutional right to due process." Doc. 34 ¶¶ 54–59. Defendants argue that Plaintiff's § 1983 claims fail because Tuskegee is not a state entity that can be sued under Section 1983. Doc. 77 at 9.

Section 1983 imposes liability on those individuals acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." *See* 42 U.S.C. § 1983. "The requirement that the deprivation be made 'under color of state law' means that the deprivation must be made by a state actor." *Charles v. Johnson*, 18 F.4th 686, 694 (11th Cir. 2021) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)). To prevail on a § 1983 claim, "[t]he state action requirement is a[] [necessary] element." *Id.* "Similarly, the Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to

acts of the states, not to acts of private persons or entities." *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982).

Tuskegee is a private institution. *See Knight v. Alabama*, 900 F. Supp. 272, 334 (N.D. Ala. 1995) (As a private institution, "the state of Alabama has no obligation to provide any particular funds to it."); *Burns v. Tuskeegee Univ.*, 2021 WL 1034971, at *1 n.1 (M.D. Ala. Mar. 17, 2021) (dismissing ADEA claims against Tuskegee and its president, which were brought against the president in her "official capacity" under *Ex parte Young*; holding "[b]ecause *Young* provides an exception to the Eleventh Amendment's prohibition of suits against *state officials in their official capacity*, his claim for injunctive relief fails because, as the Plaintiff recognizes, *Tuskegee is not a public entity, but "is instead a private sector entity."*) (emphasis added) (citation omitted). The Court has yet to find "a single case in which a court has determined that a private school's compliance with Title IX's regulations make that entity a state actor for purposes of a Fourteenth Amendment due process claim," and Plaintiff does not come forward with any authority. *See Doe v. Washington University*, 434 F. Supp. 3d 735, 749 (E.D. Mo. 2020) (quoting *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, at *25–26 (N.D. Oh. Sept. 1, 2017)). Instead, courts "agree that private colleges are not state actors by virtue of their adoption of Title IX grievance procedures." *Doe*, 2017 U.S. Dist. LEXIS 142002 at *26.

Plaintiff argues in response to Defendants' motion that because Tuskegee has "authority over a state certified law enforcement agency and operat[es] as a national

historic site for the National Park Service," that "Tuskegee qualifies as one of the rare circumstances where a 'private' institution is a state actor." Doc. 76 at 12–13.

"A private party can only be viewed as a 'state actor' for § 1983 purposes in rare circumstances." *Nobles v. Ala. Christian Academy*, 917 F. Supp. 786, 788 (M.D. Ala. 1996). Such circumstances can be determined by using one of three tests recognized by the Eleventh Circuit. *Id.* (citing *NBC v. Commc'ns Workers of America*, 860 F.2d 1022, 1026 (11th Cir. 1988). These tests are defined as (1) the "public function" test; (2) the "state compulsion" test; (3) the "nexus/joint action" test." *Id.* (citing *NBC*, 860 F.2d at 1026). "The public function test for state action has been limited strictly, and covers only private actors performing functions 'traditionally the exclusive prerogative of the State.'" *NBC*, 860 F.2d at 1026 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)). Second, "[t]he state compulsion test . . . limits state action to instances in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *Id.* Finally, the nexus/joint action test, looks at "whether 'the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" *Id.* 1026–27 (alteration in original) (quoting *Jackson*, 419 U.S. at 357–58).

Plaintiff appears to be making a "public function" argument, but Plaintiff completely glosses over the definition, which highlights that this test is "limited strictly, and covers only private actors performing functions 'traditionally the exclusive prerogative of the State.'" *NBC*, 800 F.2d at 1026. Plaintiff relies on Tuskegee University's self-identification as "state related," Doc. 76 at 12, and appears to argue that this label

transforms its status into a private institution serving as a state actor. Doc. 76 at 13. This argument is insufficient to consider Defendant a state actor.

Plaintiff argues that Court's statement in *Knight v. Alabama*—that "Tuskegee is a private institution,"—is merely dicta, (Doc. 76 at 11), and Act 292 (passed in 1880–81) supports the proposition that "[t]he school had a public status and was operated under the control of legislature appointed commissioners." *Id.* at 13. Plaintiff points out that five of Tuskegee's board members are selected by the Governor (*Id.* at 14 (citing Op. Ala. Att'ys Gen. 2003-243 (2003)); but the Board is comprised of up to 25 members. *See Board of Trustees*, TUSKEGEE UNIVERSITY, https://www.tuskegee.edu/about-us/board-of-trustees (last visited August 27, 2025). Thus, the controlling authority is not with the State-appointed members. Plaintiff insists the legislative history concerning Tuskegee makes it "distinguishable from other private schools and is a state actor." Doc. 76 at 13. Yet, in the more than 140 years since the institution's founding (Op. Ala. Att'ys Gen. 2003-243 at 3 (2003)), no case, so far as the Court can discern, has held Tuskegee is a state entity and subject to all the benefits and burdens that accompany that status. For example, the Court can find no caselaw wherein Tuskegee has asserted the immunity due a state entity under § 14 of the Alabama Constitution or the qualified immunity due some state actors. Plaintiff cites to a 2003 Opinion of the Alabama Attorney General, Op. Ala. Att'ys Gen. 2003-243 (2003), which opines "[g]iven the unique legislative history of Tuskegee University, it is neither solely a private university nor strictly a public university." *Id.* at 3. On this basis, the Attorney General concludes that "Tuskegee University is both a private and a state-related institution." *Id.* at 4.  While opinions of the state attorney general are afforded

persuasive authority, *Douglas v. Roper*, 374 So. 3d 652, 671 (Ala. 2022) ("An attorney general's opinion is not binding upon [the Alabama Supreme Court], although it can be persuasive authority."), this "state-related" assessment is not the equivalent of what is necessary to meet the public function test for private actors performing functions "traditionally the exclusive prerogative of the State." *NBC*, 860 F.2d at 1026.

Plaintiff claims that the holding in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) is "analogous" to the facts here in that the Supreme Court "examined the history of government created and controlled corporations created by statutes, ultimately finding that a government corporation created by special law is in fact a state actor." Doc. 76 at 12. Plaintiff cites to no rule or holding creating this "analogous" situation. Instead, Plaintiff claims that this is similar because the Alabama General Assembly created Tuskegee University by a special statute and because "the state of Alabama still retains some degree of control over the institution." *Id.* at 14. Notably, *Lebron* involved specific factual circumstances involving the application of the First Amendment to "government entities" and the unique role of government-created corporations in the realm of passenger trains. 513 U.S. at 383–84. The Court details the specific statutory authorization of Amtrak's incorporation and also describes how six of the nine members of the company's board of directors "are appointed directly by the President of the United States." *Id.* 384–85. Also worth noting is the Court ultimately concluded that "where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors

of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 400.

The Court finds that the Supreme Court's holding is analogous to the present case in highlighting how the state of Alabama lacks government control because the government does *not* have the authority to appoint the majority of Tuskegee's 25-member board. *See Board of Trustees*, TUSKEGEE UNIVERSITY, https://www.tuskegee.edu/about-us/board-of-trustees (last visited August 29, 2025); Op. Ala. Att'ys Gen. 2003-243 (2003).

Plaintiff similarly cites to *Pa. v. Bd. of Dirs. of City Trs. of Phila.*, 353 U.S. 230 (1957) to support the argument that "the state of Alabama still retains some degree of control over the institution." Doc. 67 at 14–15. It is unclear how the Supreme Court's holding applies here. *Pa. v. Bd. of Dirs.* involved an individual named Stephen Girard who created a fund in trust to establish a college; the City of Philadelphia was named as trustee. 353 U.S. at 230–31. Later, by virtue of a statute passed by the state legislature, the college was "operated by the 'Board of Directors of City Trusts of the City of Philadelphia.'" *Id.* at 231. The plaintiffs in the case brought this suit against the Board of Directors after the plaintiffs were denied admission to the school. *Id.* Petitioners "alleg[ed] that their exclusion because of race violated the Fourteenth Amendment to the Constitution." *Id.* The Supreme Court found that "even though the Board was acting as a trustee," because the college "is an agency of the State of Pennsylvania[,]" the "refusal to admit [petitioners] to the college . . . was discrimination by the State[]" in violation of the Fourteenth Amendment. *Id.* Nowhere does Plaintiff explain how this holding or any rule within this case supports Plaintiff's conclusion that "the state of Alabama still retains some degree of control over

32

[Tuskegee]." Doc. 76 at 14. Plaintiff has not established that Tuskegee's Board of Trustees is similarly an "agency of the State." 353 U.S. at 231. Plaintiff expects the Court to accept the proposed analogy without providing analysis or acknowledging the obvious distinctions between the factual scenarios. "[T]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments[.]" *Harris v. Warehouse Servs.*, 77 F. Supp. 2d 1240, 1248 (M.D. Ala. 1999) (quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F. 3d 587, 599 (11th Cir. 1995)).

In relation to the public function test, Plaintiff cites to public functions performed by Tuskegee such as "having authority over a state certified law enforcement agency and operating as a national historic site for the National Park Service." Doc. 76 at 12. Key to discerning whether a private actor has "perform[ed] functions that are traditionally the *exclusive* prerogative of the state" is that the function is *traditionally exclusive* to the state. *Sims v. Hassenplug*, 2006 U.S. Dist. LEXIS 50655, at *13 (M.D. Ga. July 25, 2006) (quoting *Langston v. ACT*, 890 F.2d 380, 384 (11th Cir. 1989)).

Plaintiff describes how the president of Tuskegee University has been statutorily authorized "to appoint and employ persons charged with all the duties and invested with all the powers of police officers, including the power of arrest." Doc. 76 at 12 (citing Ala. Code § 16-22-1 (2023).

The Code section Plaintiff cites to includes Tuskegee in a list with "any state college or university," as well as other private colleges including Talladega, Concordia, Samford, Birmingham-Southern, Miles, Stillman, Spring Hill, Faulkner, and Selma. *See* Ala. Code.

§ 16-22-1. This Code section requires that these university-appointed police officers "shall be certified through the Alabama Peace Officers' Standards and Training Commission." Ala. Code 16-22-1(c). Notably, the Northern District of Alabama provides direction as to the applicability of the public function test to university-appointed police officers. *See Mortazavi v. Samford Univ.*, 2017 U.S. Dist. LEXIS 112776, at *4 (N.D. Ala. July 20, 2017) ("When campus security officers stop an individual, they are performing a public function that is traditionally the exclusive prerogative of the state, making their actions state actions.").

Thus, if this were a case about police action, the analysis of a state actor might be different. When campus security officers are employed in performing stops they are undertaking a public function and thus their actions are state actions. *See id.* Plaintiff has failed to establish how the state actions of campus security officers transform the private actions of Tuskegee University or individual faculty members into public functions. The limited public functions of certain individuals within an organization do not transform a private entity into a public entity. It is a limited test that applies to those individuals engaging in the state action. *Griffin v. State of Md.*, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action.").

Likewise, Plaintiff cites to the entire "Archaeological and Historic Preservation Act of 1974" (AHPA) as a basis for finding that Tuskegee is serving a public function due to the presence of a national historic site on its grounds. Doc. 76 at 12–13 n.2. Plaintiff claims this law "designated Tuskegee as a National Historic Site." *Id.*

34

The National Park Service website cited to by Plaintiff includes an entire webpage discussing the AHPA which discusses the legislative purpose of the statute as one that "addresses the preservation of historical and archeological data that might otherwise by lost or destroyed[.]" *Archaeological and Historic Preservation Act of 1974*, NATIONAL PARK SERVICE, www.nps.gov/subjects/archeology/archeological-and-historic-preservation-act.htm (last visited August 29, 2025). AHPA is codified at 54 U.S.C. §§ 312502–312508. Separately, per the Intercoastal Shipping Act of 1933, on October 26, 1974, the Act was amended to establish "Tuskegee Institute National Historic Site" and involve acquiring "lands and interests in lands" for developing this site. *See* Public Law 93-487 (1974).

Plaintiff claims that Tuskegee's "operation of a National Historic site" make Tuskegee "unlike any other private entity." Doc. 76 at 15. However, Plaintiff has not presented the Court with case law or statutory guidance from AHPA establishing how the actions of the historic site on campus are state actions pursuant to the public function test. More to the point, Plaintiff has not shown how the status of a national historic site on Tuskegee's campus transforms the actions of Tuskegee and Tuskegee faculty in this case into "public functions that are traditionally the exclusive prerogative of the state." *Sims v. Hassenplug*, 2006 U.S. Dist. LEXIS 50655, at *13. On this record, Tuskegee's establishment, its operation of a police force, or its status as a historic site, does not convert it to a state entity for which its faculty could be considered state actors subject to liability under § 1983. For these reasons, this claim fails and summary judgment on Count IV is due to be granted.

D.    **Intentional infliction of emotional distress**

In Plaintiff's Amended Complaint, Plaintiff alleges Defendants' "actions and omissions" caused serious emotional distress, "exceed[ed] the bounds of decency and are completely intolerable in a civilized society," and "caused Plaintiff pain and suffering in the form of humiliation, depression, and suicidal ideations." Doc. 34 ¶¶ 62–64. Defendants argue that Plaintiff has failed to present adequate facts "supporting the type of extreme and outrageous conduct required to prevail on the so-called 'tort of outrage.'" Doc. 72 at 26 (citing *Eaves v. Cajun Operating Co.*, 2022 U.S. Dist. LEXIS 25801, at *22–23 (M.D. Ala. Feb. 14, 2022)). Defendants argue that accounting for the requirement that the type of conduct necessary for a tort of outrage must be "so extreme in degree as to go beyond all possible bounds of decency," and should be considered "as atrocious and utterly intolerable in a civilized society," Defendants state that "it is inappropriate that Plaintiff would even hint that his allegations are on par" with examples from cases that have satisfactorily alleged this tort. Doc. 72 at 28–29.

To establish a tort of outrage claim, the plaintiff "must demonstrate that the defendant's conduct '(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" *Wilson v. Univ. of Ala. Health Servs. Found, P.C.*, 266 So. 3d 674, 676 (Ala. 2017)). "The tort of outrage is an extremely limited cause of action." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). When determining whether certain conduct satisfies the elements of a tort of outrage, a court considers whether the conduct is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to

be regarded as atrocious and utterly intolerable in a civilized society." *Jenkins v. U.S. Fid. & Guar. Co.*, 698 So. 2d 765, 768 (Ala. 1997) (quoting *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)). "The paradigm cases" exemplifying this level of conduct include "(1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; [and] (3) egregious sexual harassment.'" *Eaves*, 2022 U.S. Dist. LEXIS 25801, at *23 (citing *Wilson*, 266 So. 3d at 677).

Plaintiff claims that Defendants decision to "withdraw as advisors" was the "extreme" conduct at issue. Doc. 76 at 24. He further claims that his "emotional ties and financial investment in his education" support his claim that Defendants' conduct was outrageous. *Id.* at 25. Nowhere in his Response does Plaintiff provide the Court with a citation to legal authority establishing that advisors' withdrawal and choosing to pay to attend a university amount to "extreme" conduct or anything analogous to what courts have found sufficiently extreme. *Id.* at 24–25.

Aside from pleading conclusory statements and labeling these actions as "intolerable," "extreme," and "outrageous," Plaintiff has not demonstrated an outrage claim under Alabama law. Additionally, Plaintiff has pointed to no genuine dispute of material fact as it relates to her claim. For these reasons, summary judgment is due to be granted to Defendants as to Count V.

### E.    <u>Breach of contract</u>

In Plaintiff's Amended Complaint, Plaintiff alleges that "[t]he policies and provisions in the Tuskegee University student handbook establish a binding agreement between these Defendants and each Tuskegee University student." Doc. 34 ¶ 67. He claims

specifically that the "procedures [Defendants] have established for handling complaints" were violated by Defendants and that these actions of violating procedures equate to a breach of contract. *Id.* ¶¶ 69–71. Defendants argue that Plaintiff has failed to establish the existence of a contract.

A breach of contract claim requires Plaintiff show "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Cook v. Talladega Coll.*, 908 F. Supp. 2d 1214, 1223 (N.D. Ala. 2012) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 303 (1999)). Further, "[t]he requisite elements of . . . [a] contract[], generally, include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Cook*, 908 F. Supp. 2d at 1223 (alterations in original) (quoting *Strength v. Ala. Dep't of Finance*, 622 So. 2d 1283, 1289 (Ala. 1993)).

While Plaintiff claims that the Tuskegee Student Handbook is the operative contract between Plaintiff and all Defendants, Plaintiff has not established how this handbook satisfies the requisite elements of a contract. *See Cook*, 908 F. Supp. 2d at 1216. The *Cook* case offers guidance to the claim alleged here. In *Cook*, the plaintiff claimed that the student handbook at issue was a contract between the defendant and the plaintiff. *See id.* at 1224. The court found that because the Handbook had "language which expressly clarifies that the document is subject to revision at the discretion of [the university]," the handbook lacked "aspects of an offer and acceptance and consideration," and no contract existed. *Id.* The court granted summary judgment to the defendant given the plaintiff's failure to establish that there was a breach of a contract. *Id.*

38

Defendants emphasize the applicability of *Cook*'s reasoning here. Doc. 72 at 25–26. Defendants highlight that, like the plaintiff in *Cook*, Plaintiff "identif[ies] no offer, acceptance, and consideration." Doc. 72 at 25–26. Defendants point to the fact that the handbook similarly allows for Tuskegee to unilaterally make changes to the handbook as it states "[t]hese regulations may be updated by a memorandum from the Provost." Doc. 73-5 at 4. In addition, Defendants cite to Plaintiff's deposition showing that Plaintiff has denied having any contract with Tuskegee outside of a contract concerning "breed[ing] cows." Doc. 72 at 25 (citing Doc. 73-1 at 259:9–260:3).

In response, Plaintiff blatantly misrepresents the content of the university handbook and claims that it "contains no provision that it is subject to revision at the discretion of Tuskegee University." Doc. 76 at 23 (citing Doc. 73-5). Further, Plaintiff claims that "the Graduate Application for Admission," which includes a research proposal, constitutes the "offer," and that the acceptance of the offer is conveyed "by the signatures of the committee members." Doc. 76 at 24. Plaintiff asserts that the funding of the research is the consideration, and that "[b]y not upholding their part of the agreement[,] Defendants breached the contract." *Id.* Again, Plaintiff attempts to impermissibly recraft his claim in his responsive brief. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."). The contract claim is based on the handbook, not any research proposal. Nevertheless, Plaintiff fails to articulate how—if the proposal is the operative contract despite his pleading—it was breached.

Plaintiff's attempt to substantiate the alleged contract by claiming that certain elements were met without providing any legal support, misrepresent the content of the university handbook, and divert the Court's attention to an unrelated research proposal, does not satisfactorily establish a breach of contract claim that should go to a jury. For these reasons, summary judgment is due to be granted to Defendants on Count VI.

## V.    CONCLUSION

For the reasons stated above, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. 71) is GRANTED. A separate judgment will issue.

DONE this 29th day of August, 2025.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE